IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JANET BILLINGS,

           Plaintiff,                                  3:10-cv-3141-ST

      v.                                          FINDINGS AND
                                                        RECOMMENDATION
MICHAEL ASTRUE, Commissioner, Social
Security Administration,

                         Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Janet Billings ("Billings"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 USC §§ 401-33.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).

For the reasons set forth below, the Commissioner's decision should be affirmed.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Billings protectively filed for DIB and SSI on March 20, 2007. Tr. 102-04, 108-10.[1] In her applications, Billings alleges a disability onset date of January 8, 2006.[2] Tr. 131. Her applications were denied both initially and on reconsideration. Tr. 54-75. Billings requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 78. On November 3, 2009, ALJ James Yellowtail held a hearing at which Billings appeared and testified, as did a vocational expert ("VE"), Kay Wise. Tr. 23-53. The ALJ issued a decision on November 27, 2009, finding Billings not disabled. Tr. 9-18.

On October 14, 2010, the Appeals Council denied Billings' request for review, making ALJ Yellowtail's decision the Commissioner's final decision. Tr. 1-3; 20 CFR §§ 404.981, 416.1481.

## BACKGROUND

Billings was born in 1956. Tr. 28. She completed high school and two and a half years of college. Tr. 29. She has past work experience as a cashier and receptionist.[3] Tr. 46-47, 260. She alleges that she became unable to work on January 8, 2006,[4] due to depression, a personality

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on April 19, 2011 (docket #11).

[2] Billings was last insured for DIB purposes through some time in 2009. The Field Office Disability Report indicates a date last insured of March 31, 2009, as does the initial Disability Determination and Transmittal on Billings' DIB claim. Tr. 57, 126; *see also* Tr. 328. However, for reasons that are not clear in the record, the ALJ found that the date last insured was September 30, 2009. Tr. 11. SSI benefits are not dependent upon insured status.

[3] Although Billings worked for a period of time as a receptionist, that work does not qualify as past relevant work because it was performed only for a short time and for fewer than 25 hours per week. Tr. 47.

[4] Initially, Billings alleged disability beginning November 29, 2005. Tr. 31, 126, 131. This was one of two dates given in the record for an automobile accident which apparently took place on or about December 4, 2005. Tr. 212 (12/8/2005 entry indicating accident was "about four days ago"), 272. Later entries in the record inexplicably indicate an accident date of November 29, 2005, which is the date initially given as an onset date. *See, e.g.*, Tr. 126, 131, 208, 280, 282. However, because Billings apparently continued to work through January 8, 2006, the onset date was later amended. Tr. 125-26.

2 - FINDINGS AND RECOMMENDATION

disorder, migraine headaches, and pain or other problems in her back, nerves, pelvis left hip, right ankle, and neck. Tr. 131.

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps. 20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ concluded that Billings has not engaged in any substantial gainful activity since the alleged onset date of her disability, January 8, 2006. Tr. 11.

At step two, the ALJ determined that Billings suffers from the severe impairments of fibromyalgia, left knee osteoarthritis, and left ankle osteoarthritis. *Id*. The ALJ concluded that her sleep apnea was well-controlled by the use of a CPAP (Continuous Positive Airway Pressure) machine and did not cause more than a minimal effect on her ability to perform work-related activities. *Id*. Additionally, he found Billings' mental impairments of somatoform disorder, affective disorder, and anxiety disorder to be non-severe because they cause "no more than a minimal effect on her ability to perform work-related activities." *Id*.

At step three, the ALJ concluded Billings has the RFC to perform unskilled, medium work which allows for a sit/stand option. Tr. 13.

At step four, the ALJ found that Billings is unable to perform any of her past relevant work.  Tr. 16.  Based on the testimony of the VE, the ALJ determined that Billings was unable to perform the full range of medium work, but could perform other work that exists in significant numbers in the national economy as a cashier with a sit/stand option, ticket taker, and packaging and light inspector.  Tr. 17.  Accordingly, the ALJ concluded that Billings was not disabled at any time between January 8, 2006, and the date of the decision on November 27, 2009.  Tr. 18.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

///

///

///

///

///

5 - FINDINGS AND RECOMMENDATION

**FINDINGS**

Billings' challenges center on the ALJ's treatment of the information provided by her treating doctor. Billings does not expressly assert error based on the step two finding that her mental impairments, including somatoform disorder, are non-severe, but does contend that the ALJ erred at step three by failing to find that she met the listings for somatoform disorders and for major disfunction of joints. Additionally, Billings contends that the ALJ failed to consider the required factors in evaluating the opinion of her treating doctor and improperly rejected an opinion by her treating doctor that she is disabled. Finally, Billings challenges the ALJ's failure to re-contact her treating doctor for clarification or additional information. Each of these arguments should be rejected.

**I. Step Two and Three Findings**

    **A. Somatoform Disorder**

        **1. Psychodiagnostic Evaluation and Psychiatric Review Technique Form**

On June 15, 2007, six months after Billings applied for DIB and SSI, Gregory Cole, Ph.D., performed a psychodiagnostic evaluation of Billings. Tr. 259-64. This evaluation took place a year and a half after Billings' injury in a December 2005 car accident. The previous day, at an appointment with her primary care doctor, James F. Calvert, Jr., M.D., Billings reported pain and exhibited pain behaviors to such an extent that it was difficult to examine her. Tr. 267. Nevertheless, at her appointment with Dr. Cole, Billings exhibited "no psychomotor agitation or slowing, and no unusual physical mannerisms or gestures." Tr. 261. She scored an 18 on the Beck Depression Inventory-II, indicating "a mild level of self-reported depression symptomatology." Tr. 262. She had no significant problems in the areas of attention and


concentration, had average immediate and above average delayed memory capabilities. Tr. 263. Dr. Cole found that Billings exhibited symptoms "consistent with diagnoses of depression, an anxiety disorder, and a pain disorder associated with psychological factors and a general medical condition." Id. Accordingly, he found Billings to have an Axis I diagnosis of Major Depression, Recurrent; Anxiety Disorder, NOS; and Pain Disorder Associated with Psychological Factors and a General Medical Condition. Id. He felt that she "could benefit from follow-up psychological services and behavioral medication management." Id.

A few weeks later, Peter LeBray, Ph.D., completed a Psychiatric Review Technique form. Tr. 302-15. Dr. LeBray evaluated Billings' impairments under Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.07 (somatoform disorders). Tr. 302. He concluded that the limitations imposed by Billings' impairments satisfied neither the paragraph B nor the paragraph C criteria concerning these listings and. therefore. found her impairments to be non-severe. Tr. 312-13.

### 2. Paragraph B Criteria

Billings contends that the ALJ erred by failing to find that she met Listing 12.07 for somatoform disorders, 20 CFR Part 404, Subpt. P, App. 1, § 12.07-2(d) and (e), because of her somatic pain. The paragraph B criteria for somatoform disorders requires a showing of two of the following four limitations: (1) marked restriction in the activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. Based on a review of Billings' activities of daily living, medical reports, and Dr. Cole's report, which he assigned "great weight," the ALJ found no more than mild restriction

in the first three areas and no episodes of decompensation. Tr. 12. A review of the record reveals no basis to overturn that conclusion. Moreover, Billings does not cite any contrary evidence or explain how other evidence in the record would justify a more limiting finding.

Accordingly, the Commissioner's decisions that Billings did not provide evidence which would satisfy the paragraph B criteria for Listing 12.07 should be upheld, and Billings' argument that her impairments meet or exceed the Listing 12.07 criteria should be rejected.

### B. Major Disfunction of Joints

Similarly, Billings challenges the ALJ's failure to find that her impairments meet Listing 1.02 for major disfunction of joints.

The ALJ considered this listing and found that no treating or examining physician mentioned findings equivalent in severity to the criteria. Tr. 13. Although the ALJ gives no further explanation, Billings also fails to explain why she meets this listing. She simply states that she meets Listing 1.02 A and B due to the involvement of her left knee and ankle which are weight bearing joints. This is not sufficient to for the court to conclude that the ALJ committed reversible error.

## II. Treating Doctor's Opinion

Billings' remaining challenges to the ALJ's decision center on his consideration of the information provided by her treating doctor, Dr. Calvert, a family practitioner.

### A. Legal Standard

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as

8 - FINDINGS AND RECOMMENDATION

an individual. *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007). When a "treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [the Commissioner] will give it controlling weight." 20 CFR §§ 404.1527(d)(2), 416.927(d)(2).

When a treating physician's opinion is not given controlling weight, it is still entitled to deference and must be evaluated by applying the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the support underlying the medical opinion, particularly medical signs, laboratory findings, and supporting explanations; (4) the consistency of the opinion with the record as a whole; (5) whether the medical source is a specialist and is giving an opinion in his or her area of specialty; and (6) other factors such as the medical source's familiarity with the disability insurance program and its evidentiary requirements and the extent of the medical source's familiarity with other information in the claimant's case record. SSR 96-2p, 1996 WL 374188 (July 2, 1996); 20 CFR § 404.1527(d)(2)-(d)(6); 20 CFR § 416.927(d)(2)-(d)(6).

If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Orn*, 495 F3d at 632; *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006). Even if the opinion is contradicted by another physician, the ALJ may not reject it without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F3d at 1066 n2.

9 - FINDINGS AND RECOMMENDATION

However, an opinion by a nonexamining medical source may serve as substantial evidence when it is supported by and is consistent with other evidence in the record. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999) (citation omitted).

### B. Treatment Relationship

Dr. Calvert and his colleagues at the Cascades East Family Practice Center in Klamath Falls, Oregon, treated Billings monthly during at least the nearly six year period preceding the November 27, 2009 decision by the ALJ. Tr. 203-39 (1/29/2004 – 4/27/2006), 266-82 (5/25/2006 – 6/21/2007), 322-27 (7/12/2007 – 10/18/2007), 339-63 (11/15/2007 – 4/21/2009), 371-81 (5/7/2009 – 10/13/2009). The earliest notes in the medical record dated January 29, 2004, state that Dr. Calvert had followed Billings "for some time," treating her chronic back pain due to sacroiliac joint dysfunction, chronic arthritis in her right ankle, depression, and a mood disorder. Tr. 239; *see also* Tr. 237 (chronic back pain of uncertain etiology, chronic depression, and a mood disorder). Dr. Calvert performed trigger point injections and prescribed the pain medications Roxicet (acetaminophin and oxycodone) and Naprosyn (naproxen) and the antidepressant, Effexor (venlafaxine). Tr. 233, 239.

After Billings started working as a cashier in a casino in mid-January 2004, she became less depressed and began losing weight, but her back, right ankle, feet and knees became more painful due to standing for long periods of time at her job. Tr. 238-39. Dr. Calvert prescribed pain medications and provided trigger point injections. *Id*. Billings also began to have difficulty sleeping due to her pain after her work shift ended. Tr. 237. Dr. Calvert prescribed Trazodone and Valium (Diazepam) to help her sleep. Tr. 237.

///

In the monthly visits that followed, Billings continued to report chronic ankle, knee, and back pain, and Dr. Calvert responded with additional pain medications and targeted injections. Tr. 236-38. On May 11, 2004, Billings slipped and fell on a concrete pier, bruising her left knee and fracturing three ribs. Tr. 235, 247. She took a few days off work and then continued monthly appointments with Dr. Calvert and his colleagues who continued to treat her ankle, knee, and low back pain with trigger point injections and pain medications. Tr. 230.

By September 8, 2004, Dr. Calvert opined that Billings had "chronic pain of uncertain etiology, probably fibromyalgia" and "has been depressed on and off and probably has bipolar disease." Tr. 232. On January 23, 2005, Billings slipped on ice and fell onto her left hip. Tr. 227. This resulted in additional back and ankle pain, but did not stop her from working except for one day. Tr. 224. Although she was a "little bit depressed," Billings had discontinued her Effexor. Tr. 224. Dr. Calvert noted that she "really does not do nearly as well when she is not taking an antidepressant" and "emphasized to her that it is important for her to continue on this medication." *Id*. Billings continued with regular follow-up appointments, and continued to receive injections and pain medications to address her back, knee, and ankle pain, as well as antidepressants.

In late 2005, Billings injured her neck, hip, and wrist when the car she was driving hit black ice and spun out of control into an embankment. Tr. 212, 280. She continued to work after the accident, but her neck pain increased, prompting Dr. Calvert to refer her to physical therapy and take her off work for two weeks in early January 2006. Tr. 208-09. Billings went to physical therapy three times a week and seemed to be experiencing some improvement, but was not ready to go back to work by the end of January. Tr. 208. Dr. Calvert took her off through

11 - FINDINGS AND RECOMMENDATION

March 1, 2006.  Tr. 208.  However, Billings still did not improve sufficiently and Dr. Calvert again extended her time off work through May 1, 2006.  Tr. 207.

In late April 2006, Billings' employer notified her that if she did not return to work on May 1, 2006, she would lose her job.  Tr. 203.  Billings lost her job shortly thereafter.  Tr. 282.  By the end of July 2006, her automobile insurer refused to pay for any additional physical therapy based on the results of an independent medical examination which concluded that she had reached the maximum benefit of physical therapy relative to her cervical strain.  Tr. 280.  Billings continued to experience neck pain and pain in her wrists and right hand.  *Id*.  By August 2006, she also reported developing pain in her right shoulder, radiating down her right arm.  Tr. 279.  In September 2006, Dr. Calvert deemed Billings "essentially stable," although he believed additional physical therapy would be beneficial if there were some way to pay for it.  Tr. 278.

Over the course of the next months, Billings continued to report pain in her neck, right arm and shoulder, and right thumb and wrist.  Tr. 275-76.  Dr. Calvert thought Billings suffered from "some kind of fibromyositis, fibromyalgia exacerbated by a motor vehicle accident a couple of years ago."  Tr. 274.  Dr. Calvert continued to administer trigger point injections and prescribe pain medications for Billings through the end of 2007 and continued to believe that physical therapy might help if there were some way to pay for it.  Tr. 267-68, 324-27.  Her laboratory workups were "[g]enerally normal . . . in terms of MRIs, x-rays, and so on."  Tr. 363.  By mid-November 2007, Dr. Calvert concluded that Billings:

> has some kind of difficult to pin down pain syndrome exacerbated by a motor vehicle accident a couple years ago, but essentially also an ongoing chronic problem.  No clear neurologic or physiologic diagnosis.  [She] comes in every month.  We get some essentially

12 - FINDINGS AND RECOMMENDATION

> supportive psychotherapy done and renew her pain medication.
> The diagnoses for this visit would be chronic pain syndrome,
> fibromyalgia, and muscle spasms in the neck.

Tr. 363; *see also* Tr. 362 ("basically no change in her condition").

Billings continued to experience pain in her neck, back, legs, arms, shoulders, and hands into 2008. Tr. 358-61. She continued to see Dr. Calvert who continued to prescribe a "fairly aggressive pain management regimen" and antidepressants. Tr. 356; *see also* Tr. 355 (5/22/2008 renewal of all prescriptions for 90 days).

On March 13, 2008, Dr. Calvert completed a Loan Discharge Application on behalf of Billings. Tr. 330-31. In that document, Dr. Calvert opined that Billings had a "long standing problem" of "chronic neck, back & shoulder pain that is not responding to treatment." Tr. 330. Dr. Calvert noted that it was "unlikely" that Billings would ever have the ability to engage in any form of employment and checked a box indicating that her percentage of disability was "considered to be 100%." Tr. 331. Dr. Calvert gave an onset date of November 26, 2005.[5] Tr. 330.

By July 2008, Billings' thumb was bothering her sufficiently that Dr. Calvert thought she might have carpal tunnel syndrome or arthritis. Tr. 354. She continued to experience "her usual pain in her back and her legs and neck," prompting another refill of her prescription medications. *Id*. An EMG, nerve conduction study and bone scan regarding her thumb came back normal. Tr. 352.

In January 2009, Dr. Calvert reported that Billings was "stable in terms of her chronic pain syndrome with neck and back spasms and pain in her shoulders and so on pretty well

---

[5] *See supra* note 4.

controlled by her opioids which allow her to function and get things done around the house." Tr. 348. In February 2009, Dr. Calvert referred Billings for a neurological evaluation due to her "[c]hronic pain of unknown etiology, weakness and shaking of unknown etiology, [and] occasional malfunction of the lower extremities of unknown etiology." Tr. 347. He also administered "a bunch" of trigger point injections in Billings' back and hip. *Id*.

In mid-March 2009, Dr. Calvert summarized Billings' history and his assessment as follows:

> [Billings] has a long history of chronic pain. She somatizes. She has a lot of histrionic reactions to her pain. She has been depressed though that does not seem to be a real prominent symptom right now.
> 
> \*   \*   \*
> 
> [Billings] continues with chronic pain – a mixture of fibromyalgia, musculoskeletal problems and somatization disorder.

Tr. 343.

His April 21, 2009 chart note contains a similar assessment:

> This is a patient with multiple somatic complaints. She basically has somatization disorder. She is on opioids with oxycodone 10 mg 3 times a day. This keeps her pain pretty well under control. She has pretty significant osteoarthritis in her left knee and in her right hand, also probably in the C-spine.

Tr. 339.

Dr. Calvert continued to treat Billings through the date of the hearing before the ALJ. Tr. 370-81. She continued to experience "unexplained neurologic symptoms and unexplained pain." Tr. 371. Dr. Calvert noted that she suffers from "numerous problems that we have never been able to find an organic basis for, weakness, stumbling, poor gait, swelling in her hands, painful hands, tremor and so on." *Id*. He thought there "is probably some kind of a mixture of

14 - FINDINGS AND RECOMMENDATION

somatic and psychiatric disease" at play. *Id*. He continued her on opioid therapy for her chronic pain.

### C. Dr. Calvert's Opinion as to Disability

Citing Exhibit 11F (tr. 330-31), Billings contends that the ALJ failed to give sufficient weight to her treating doctor's opinion that she is disabled. Whether the claimant is or is not "disabled," whether a group of impairments meets or exceeds a listed impairment, and what abilities and restrictions define a claimant's RFC are issues reserved to the Commissioner, and a medical source's opinion on those issues is not entitled to special significance. 20 CFR §§ 404.1527(e), 416.927(e).

The ALJ conducted a thorough review of the medical record, including Billings' treatment history with Dr. Calvert. Tr. 14-16. He expressly gave "no weight to the opinion of Dr. Calvert found in the loan discharge application because he did not provide a functional assessment of the claimant and he made a conclusory statement regarding an issue reserved to the Commissioner." Tr. 16.

Although the record is replete with monthly chart notes concerning the symptoms experienced by Billings, Dr. Calvert provides little information on how those symptoms translate into functional restrictions. He found her incapable of returning to work at her job as a cashier at a casino and repeatedly treated her complaints of pain with trigger point injections and prescriptions for pain medications. However, he could find no objective basis for most of those complaints, eventually concluding that Billings suffered from a "mixture of fibromyalgia, musculoskeletal problems and somatization disorder." Tr. 343.

///

15 - FINDINGS AND RECOMMENDATION

In contrast to Dr. Calvert's summary opinion that Billings was 100% disabled as of March 2008, in a Physical Residual Functional Capacity Assessment dated July 2, 2007, Martin Kehrli, M.D., found no postural, manipulative, visual, communicative, or environmental limitations. Tr. 294-301. Instead, Dr. Kehrli found Billings capable of lifting 50 pounds occasionally and 25 pounds frequently, standing and sitting for about six hours in an eight hour workday, and no restrictions on pushing or pulling. Tr. 295. Dr. Kehrli based his assessment on the medical chart notes which revealed a history of completely normal imaging studies, the lack of any signs of decreased neurological function in any extremities, and the lack of any additional trauma. Tr. 300-01. He also found Billings' statements as to her symptoms not to be fully credible. Tr. 299.

In evaluating the differing conclusions as to Billings' capability for performing work activities, the ALJ turned to other information in the record, including the testimony of and function reports completed in May 2007 by Billings (tr. 138-45) and her friend (tr. 146-53). Tr. 16. The ALJ found Billings' allegations consistent with a diagnosis of somatoform disorder in that there were virtually no objective findings to support the allegations. *Id*. He also found that the function reports revealed that Billings was "capable of more activity than alleged even with the pain disorder in mind." *Id*. Based on these observations, the ALJ found Billings' allegations of disabling limitations less than credible and flatly rejected Dr. Calvert's statement in the Loan Discharge Application that Billings was totally permanently disabled.

Thus, the ALJ's decision to reject Dr. Calvert's conclusory statement as to Billings being 100% disabled is a rational reading of the record and should not be disturbed.

///

16 - FINDINGS AND RECOMMENDATION

### D. Failure to Consider Proper Factors

Billings also contends that the ALJ erred by failing to consider certain factors when evaluating Dr. Calvert's chart notes and opinion. With regard to the factors listed in 20 CFR §§ 404.1527(d)(2)-(d)(6) and 416.927(d)(2)-(d)(6), the record reveals nothing about Dr. Calvert's familiarity with the disability insurance program and its evidentiary requirements. Thus, that factor is neutral. The first two factors, however, weigh in Billings' favor because Dr. Calvert enjoyed a treatment relationship with Billings that lasted more than six years and involved appointments every four to six weeks during that time period. As her primary doctor, Dr. Calvert treated Billings for a variety of ailments, performed routine annual examinations, and managed her ongoing difficulties with chronic pain and depression.

The remaining relevant factors weigh in favor of upholding the ALJ's decision. The records from Dr. Calvert refer to ongoing chronic pain and depression management issues. With minor exceptions, every objective test administered on Billings after the January 8, 2006 onset date yielded normal results.[6] Little in the way of a supporting explanation accompanied Dr. Calvert's opinion that Billings was 100% disabled, other than her long-standing problem with back and neck pain which had not responded to treatment. By the end of 2008, Dr. Calvert suspected that Billings' difficulties stemmed from somatization. Tr. 349. However, Dr. Cole's

---

[6] *See* Tr. 284 (3/16/07 X-ray of right elbow), 293 (11/16/06 right hand radiology report); 329 (3/7/08 X-ray of right ankle), 343 (3/12/09 entry noting that neurologist "just kind of threw up his hands . . . which is a reasonable reaction. She is a very difficult patient to assess."), 352 (9/11/08 entry noting no abnormalities on EMG and nerve conduction studies and a normal bone scan), 355 (5/22/08 entry "numerous complaints that are not totally consistent with any particular neurological specificity"), 358 (3/13/08 entry "long-standing history of chronic pain characterized by unremarkable objective studies"), 363 (11/15/07 entry "generally normal workup in terms of MRIs, x-rays, and so on"), 364-65 (4/25/09 MRI of C-spine), 366 (4/21/09 left knee x-ray), 367 (9/19/08 brain MRI), 368 (9/16/08 brain MRI), 371 (5/7/09 entry "patient . . . has numerous problems that we have never been able to find an organic basis for"), 373 (7/23/09 entry "patient has a long history of unexplained pain and unexplained neurologic symptoms. We have done many consultations, many imaging studies, and at this point we are just managing her conservatively treating her pain with opioids."), 244 (1/11/2006 C-spine radiology report), 245 (1/5/2006 cervical spine series radiology report), 246 (1/5/2006 right shoulder radiology report), 382-83 (4/25/09 MRIs of C-Spine), 384 (9/9/09 CT of abdomen and pelvis).

17 - FINDINGS AND RECOMMENDATION

psychodiagnostic evaluation of Billings found only mild restrictions imposed as a result of her mental impairments. Tr. 259-64. Moreover, one of the observations underlying Dr. Kehrli's assessment is that Dr. Calvert based his evaluations of Billings' ability to work on her previous relevant work as a cashier, which required her to stand on her feet all day and exacerbated her preexisting difficulties with back pain. Tr. 300. The ALJ expressly found that Billings was limited to work with a sit/stand option in order to account for this difficulty. Tr. 13.

In sum, the record reveals that the ALJ did take into account the relevant factors when evaluating Dr. Calvert's records and opinion. Accordingly, there is no basis to reverse the ALJ's decision on that basis. Billings' argument to the contrary should be rejected.

### E. Failure to Develop the Record

Lastly, Billings asserts that the ALJ failed in his duty to develop the record. The claimant must provide evidence relating to his or her impairments and their severity. 20 CFR §§ 404.1512(a) & (c), 416.912(a) & (c). However, the ALJ has a duty to develop the record when the claimant's onset date is ambiguous, *Armstrong v. Comm'r*, 160 F3d 587, 590 (9th Cir 1998), or when the record is too inadequate for the Commissioner to make a proper disability determination. 20 CFR §§ 404.1513(e), 416.913(e); *Bayliss v. Barnhart*, 427 F3d 1211, 1217 (9th Cir 2005).

In this case, the ALJ did not find the record inadequate or ambiguous. Instead, he carefully evaluated over six years of medical records, Billings' testimony and the reports she and her friend submitted, and the testimony of a vocational expert. The medical records reflect chronic pain exacerbated by involvement in an automobile crash and accompanying fall. Pinning down the cause of Billings' chronic pain with objective testing proved fruitless, and Dr. Calvert

eventually concluded that Billings had somatization disorder. His one-line conclusion that Billings was 100% permanently disabled was accompanied by little or no explanation and was contradicted by other significant evidence in the record. This court cannot conclude that the record was inadequate to make a proper disability determination.

## RECOMMENDATION

For the reasons stated above, the Commissioner's decision should be AFFIRMED, and this case should be DISMISSED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due October 11, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 21st day of September, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

19 - FINDINGS AND RECOMMENDATION